Mr. Davidson. Good morning, Your Honors. May it please the Court, my name is Steve Davidson. I'm here on behalf of First Dakota National Bank. I want to begin with a little bit of context about collateral assignments. This was a $42.5 million commercial loan to an ethanol plant in north central Nebraska. When lenders make those kinds of loans, taking a security interest just in the hard assets themselves, the equipment, plant, etc., doesn't provide the necessary protection to the lenders when there's a business like this whose ongoing value as an enterprise is dependent upon a contract that's in place with a third party. In this instance, you can't run an ethanol plant unless you have rail tank cars to take the ethanol out to where it's being sold. And without that, the value of the plant itself to the lenders as collateral is not the same. That's why these contracts are so critical. Another example may be a loan to a manufacturing facility that has a building full of leased equipment. The lender's going to not only take an interest in that building, but is going to take an assignment of that lease because if there's a default, selling that building with the equipment in it is worth a lot more to the lenders than selling the building. That's why these contracts are so critical. And in that function, the fact that they always contain this notice obligation on the counterparty to the contract, the outside third party, to give the lender notice that there's been a default by the borrower and an opportunity to cure that default, that's the most important term in the contract because that's what protects the lender's ability to keep that important contract in place to preserve the ongoing value of its collateral. That's the context in which this breach occurred by EcoEnergy. The second bit of background that I think is really critical to your evaluation of these facts is the fact that the lender here is not ag country. It's a participated loan of nine lenders, including several farm credit entities, which often happens when you've got a $40 million loan. First Dakota National Bank can't loan that much money, so you participate the loan out, which means the interest is spread amongst that lending group. And this is a very unusual circumstance because usually the lead lender in a situation like this has the biggest piece of the loan. By the time these events occurred, the lead lender here, ag country, had divested itself of most of its interest and held only 14%. First Dakota National Bank was the majority lender. Was there a provision on how First Dakota could have become the lead participating? You know, I don't know. I'm sure that's the credit agreement is about 150 pages. I bet it's in there somewhere. I bet it is, too, but I can't. Usually they assign votes and all kinds of things. Go ahead. Right. What we know is in this case, ag country remained the lead lender. But First Dakota had $8 million in this credit facility. And First Dakota was dependent, its interest in that loan was dependent upon ag country's representation of its interest as lead lender. And so ag country's job was to protect the interest of that group in a context where when a decision is made about, okay, we've got this notice about these rail cars potentially being a default. This is an important part of our collateral base. Should we advance another $130,000 on a $42 million loan to protect this asset? That was not ag country's decision to make. That was a decision to be made by the majority of the participants in this participated loan. Ag country's not a party to this case, though, right? They are not. Nobody's suing ag country somewhere, somehow. That is correct. Okay. Go ahead. So you take that context and then you look at what we start with, which is an admission by EcoEnergy that, yes, this collateral assignment was in place. Yes, it contained an obligation on us to tell you lender if there was a default and give you a reasonable opportunity to cure. And the evidence is, undisputed, we forgot about it. We lost the document. We didn't know we were supposed to give you that notice. And so we breached. We acknowledged that we breached. The only question left for Judge Girard to decide, and now which is on appeal to you, is how does causation work in that scenario? And it's a really, it's an interesting scenario in that the whole case, the whole trial we did was, as Judge Girard asked us to present it, a question about events that never occurred. You know, the question I think he wanted us to, you know, his decision was, bank, you haven't satisfied your burden of proof to convince me that ag country would have paid the money to cure. That was his finding. How do we do that? We're talking about an event that never happened. And going back to witnesses and say, Mr. Witness, if this notice would have been given, then what would you have done? Isn't that, doesn't that often happen in cure cases all the time? That's what the cure is about. You don't know. Sure, it does all the time. Yeah. But the issue is not, you know, so what you do in those cases is you present the full universe of facts and circumstances. You say, here was everything that would have affected that decision. But the legal issue here is, what's the standard to be applied to the causation issue? Is it proving subjectively, ag country would have cured, which is inherently speculative, unknown, because eco energy, by its breach, prevented those sequence of events from ever happening. So we don't know what they would have been. But what the district court did was looked at the related actions of the parties. Was there a willingness to extend financial support to this company that is admittedly not doing well, even at that time? So it's not completely speculative. Craig, you're looking at the situation at the time. What are they doing otherwise in relation to this financial- Sure. And in that regard, what the district court did was look to ag country's decision to not advance funds at an earlier point in time. And the important thing to remember there is that, if you look at this objectively, is when those decisions were made, there was, at the same time, a very active set of communications going on about the possibility of Tenasca, the big investor and majority owner of the ethanol plant, paying that money to cure the default itself. And the bank is sitting there watching this happen. Why is a bank going to say, okay, here's our $130,000, when it knows that one of the investors in the ethanol plant is giving active consideration to paying that money itself? So that, at that point in time, there's no motivation for the lender to do anything but sit back and watch. And the lender knows that this rail car collateral of mine is not at risk of being lost to me until I get that written notice from EcoEnergy that I'm entitled to under this collateral assignment, telling me the world has changed, I'm going to take these cars away from you. Then it shifts to, now it's my decision. And I think what Judge Girard did was he looked at some of those initial facts. We gave him a very rich record about all the other reasons why a reasonable lender would unquestionably pay this small amount of money in this context to preserve this collateral. But what he said at the end of the day was, I'm not convinced that ag country would have cured. And part of that was because they didn't testify. What he should have done is said, because this is a scenario where events were prevented from happening by the breach itself, the question he should have asked is, what would a reasonable lender have done in all the facts and circumstances? A reasonable lender or a reasonable ag country? I mean, you still can't sort of slice out the lender. I mean, when you say a reasonable ag country, to me it's kind of the same thing. You put a reasonable decision maker in the shoes of ag country, you evaluate all the surrounding objective facts and circumstances, and you say, what would a reasonable lender have done? And in this case, as I said, you've got the dollars, of course. You've got a market value for these cars that had increased more than fourfold in two years. You've got an ethanol plant that is temporarily idle, waiting for the price of corn and ethanol to move so that it's profitable to reopen again. Obviously, if you're going to reopen again, you need the cars to ship your ethanol out. And you've got other parties ready and willing to pay the money for you as a lender. The lender's sitting there and it goes, I've got Tenasca, the majority owner, who's going to fork over $130,000, and we know that because ultimately they actually did so. And if you're ag country, you know, I've got 17% of this loan. I've got First Dakota National Bank over there who's got double, more than double the money in this debt that I do. I know they're going to want to pay this $130,000 because the economics of this situation makes sense that even given First Dakota's 28 approximately percent interest in the loan, the value of this collateral just to its share way more than justifies the money necessary to keep the lease in place. So had Judge Girard looked at that full universe and evaluated it, our position is that it would be impossible to conclude otherwise that a reasonable lender in these circumstances would have cured. Now, I think where Judge Girard went wrong is that he phrased it as a burden of proof issue. And he said, if you read towards the end of the opinion especially, what he talks about is, you know, here's all the evidence that's in front of me. I'm not convinced, First Dakota, that you have proven to me that ag country would have, ag country itself would have cured. It's not the same question because that's a subjective question about that particular lender. It's a broader issue than that because it's causation. And causation should be an objective test, not a subjective test. I'll save the remainder of my time for rebuttal. Thank you. You may. Mr. Hicks. Good morning, Your Honor. I'm John Hicks and I represent EcoEnergy. Judge Girard told us in his summary judgment opinion at pages 12 and 13 that what we were going to try in front of him was the issue remaining for trial as being his to consider evidence that NEDAC's lender, ag country, would have actually stepped in and cured NEDAC's default. He did not tell us that we were going to try a case about what TANASCA would do. He did not tell us that we would try a case about what First Dakota would do. He did not tell us that we would try a case about what some hypothetical, reasonably prudent lender would do. He told us, correctly I would suggest to the court, that we are going to try what would ag country have done. At its core, First Dakota's appeal rises and falls here with its attack on Judge Girard's findings of fact and I think it's appropriate for us to consider what we should do or what Your Honors will do in considering this challenge to the findings of fact. Judgment in your opinion in the IPSCO tubular case tells us what this court will do. This court will review factual findings for clear error. Factual findings are clearly erroneous only if they're not supported by substantial evidence or this court is convinced that the legal analysis was wrong or this court is left with a definite and firm conviction that an error was made. The IPSCO tubulars case quoted several other cases and said that we're essentially where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous. So in response to Mr. Davidson's argument that we should consider what would happen with all of these other parties, that's not what Judge Girard told us to try and that's not the issue at hand. The issue at hand is what would ag country have done and what are the factors that Judge Girard considered? He considered that the right to receive notice, the notice that First Dakota complains that ECO admittedly did not give, belongs solely to ag country. That notice doesn't belong to any other party. What he also considered was that ag country was fully advised of what was going on with NEDAC and its business operations in 2012. What about the counter point that well maybe they were fully advised but they hadn't gotten any formal notice of that default with an opportunity to cure and so really didn't feel the urgency yet? Judge Kelly, what they knew progressively was that ECO had called a default. They knew this because Mr. Fagerlund, the president of NEDAC, told them. They knew that ECO Energy was taking possession of the rail cars. They knew that because Mr. Fagerlund told them that and there's no evidence in the record to say that to show that they would have done the same thing. Anything else had they received a piece of paper that said here's your notice of what you already know. They had actual notice and First Dakota submitted no proof that they would have done anything any different than what was actually done. The things that Judge Girard considered in drawing his conclusion were the testimony of Mr. Fagerlund and Mr. Fagerlund's view that ag country had had enough. They understood what was going on with NEDAC. They understood the status of the financial condition of NEDAC and they did have actual knowledge of what was happening with these rail cars. There was also testimony from Mr. Fagerlund that's critical that on behalf of NEDAC, he went to ag country and asked for the money to cure the default in the ECO Energy lease and ag country declined. There's no bona fide dispute to the claim that that ag country knew. Judge Girard found that. There was no dispute in the record and there's no real basis to conclude that ag country would have done anything any different than it did. First Dakota argues that we should look at this from the standpoint of what a reasonable lender would do, but that's not what the standard should be. What the standard should be is what did this lender do? What did the facts that were adduced at trial indicate that this lender would do? The facts that were adduced at trial indicated that this lender had had enough, that this lender was not had no intention of curing this default. In fact, there was testimony at trial that this lender knew of the importance to any future operations of the rail cars that were at issue in the lease. A state though, so you we address his argument, a state could adopt an objective standard. They could make it real clear that it's an objective standard. You know what his argument is. And so if North Dakota had done that, he would have a strong point. Please address his main argument about the North Dakota law being objective, objective standard. Well, may it please the court, the North Dakota statute we would submit doesn't say what First it says is that this is an issue on the measure of damages in a contract case. And what the statute says, and it's a long adopted statute, and it discusses proximate cause or things.  The ordinary course of things. Well, the cases that we found that we referred to, the Vallejo case, indicate that what that addresses is the Hadley versus Baxendale consequential damages issue and not what would some reasonably prudent lender do. What would the effect be if a What we have here in considering the objective facts are the facts that Judge Gerard considered when he concluded that ag country had no intention or that actually First Dakota did not meet its burden to show what ag country would have done. So the objective facts that were circumstances. The surrounding circumstances were those that I discussed earlier. The fact that the plant had shut down. The fact that ag country knew that the rail car lease was in default. That ag country was asked to fund the defaulted lease payments. Is there any other North Dakota law, statutory, or case law that helps us address this particular issue? Your Honor, none that we found that we were able to cite in our brief. If there is, we did not find it. But we believe that what happened here is that Judge Gerard considered the objective manifestations of what the intent of ag country was in this particular instance and concluded that ag country would not have cured. That ag country had had enough of this and that ag country sought to reduce its exposure and not advance additional funds. So really what the district court is saying is if having made that finding a fact that you just then it wasn't damaged. It wasn't damaged by a lack of notice. That's correct, Your Honor. It's a damage question. That the absence of receiving a piece of paper confirming what ag country already knew was not the proximate cause of any damage to ag country. Because, again, ag country knew and ag country made its decision not to step forward and cure and not to advance additional funds. And unless the court has further questions from me, I'll yield to my colleague. Thank you for the argument. Mr. Davidson. It's fact finding on the wrong question is what happened. Because the question is, is driven by North Dakota law and proximate cause. And this is an unusual circumstance, so there isn't a case. But what we do see in North Dakota law is that when you're talking about contractually significant events, it's not just a piece of paper. It's a contractually significant event. And there is North Dakota law talking about mutual assent to a contract being that I've given you in the brief talking about conditions in a contract that require knowledge of a party. You don't have the party come and say, I knew, therefore, the condition is satisfied. You look at all the surrounding facts and circumstances and you determine would a reasonable person in the shoes of that party know enough so that the condition is- Is Vallejo the closest case? Yeah, it's Mowen and Dan Nelson construction are the two that I'm referencing. And then you look at the statute, you look at the common law definition of proximate cause in North Dakota that talks about damages flowing from the breach. I either ask a bad question or you gave the answer to the wrong question. Is Vallejo really the closest case on this statute? Vallejo versus Jamestown College, 76- I think so. Vallejo is a case that just kind of generically talks about causation. And that's the closest case. I think so. Me too. But as I said, there are contract cases in North Dakota that apply this objective test. And all this proximate cause issue, the point of all this law I gave you from North Dakota is that proximate cause is always viewed objectively. And that's what should happen here. Well, if this objective, if this reasonable lender that you describe must have all of the characteristics of the actual lender in the case and be faced with all of the circumstances, then what's the difference? What's the difference between the subjective and objective in this kind of case? The difference happens because in this circumstances, the event that caused activity never happened. What we're trying to evaluate is what would have occurred had this very important contractual notice been sent to the lender that changes the universe of circumstance. And everything that happened before that really, you can, I suppose, draw inferences from that if they're relevant. But what you're looking at to decide here is a decision that never got to be made. Facts that never got to be created because a contract was breached and the notice was never given. And when you're in that world of speculative testimony, looking at what an objective lender would do is the most reliable way to approach it. Thank you for the argument. Thank you. Case number 16-4391, First Dakota National Bank versus Echo Energy LLC, is submitted for decision and the court will